# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

———————————————————————

JOANNA S. BROWN,
o/b/o  A.B.,                                  Plaintiff,

        v.                                                    5:14-CV-1059
                                           (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,
                                 Defendant.

———————————————————————

JAYA A. SHURTLIFF, ESQ., for Plaintiff
DAVID L. BROWN, SPECIAL ASS'T. U.S. ATTORNEY for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

    Plaintiff Joanna Brown filed an application for Supplemental Security Income ("SSI") payments on behalf of her daughter, A.B.,[1] on December 2, 2010, claiming a disability onset date of October 5, 2002. (Administrative Transcript ("T.") at 11, 149-54).  Plaintiff's application was initially denied on May 6, 2011 (T. 60), and she made a timely request for a hearing before an Administrative Law Judge ("ALJ"). (T. 71-73).  The hearing, at which plaintiff appeared with A.B., was conducted by video conference on August 6, 2012. (T. 24-59).

———————————————

[1] Throughout this Report, the child on whose behalf this action was brought will be generally referred to as "the claimant" or by her initials  "A.B."  Joanna Brown, who commenced this action on behalf of her daughter, will generally be referred to as "plaintiff."

In a decision dated January 8, 2013, the ALJ found that A.B. was not disabled. (T. 8-23). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 12, 2014. (T. 1-4).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)    The ALJ erred in his determination that A.B.'s impairments were not functionally equivalent to "the listings." (Pl.'s Br. at 10-15).

(2)    The ALJ did not properly weigh the medical evidence. (Pl.'s Br. at 15-16).

Defendant argues that the Commissioner's decision is supported by substantial evidence, and the complaint should be dismissed. For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III.   FACTUAL OVERVIEW

The court will only briefly summarize the medical, educational, and other evidence, which is set forth at length in plaintiff's brief (Pl.'s Br. at 2-7) and in the ALJ's decision. (T. 12-17). Further relevant details are discussed below in the course of analyzing the issues disputed by the parties.

Claimant A.B. is a female child, born on October 5, 2000. (T. 29, 149). As of the date of the administrative hearing, A.B. was eleven years old and about to start the seventh grade. (T. 29). She lived with her mother, father, two sisters and one brother. (T. 32, 280-81).

After she began school, A.B. was diagnosed with attention-deficit hyperactivity disorder ("ADHD"), and was treated with medication and outpatient therapy. (T. 182-

83, 248, 379, 482). Her attention and concentration had shown improvement when she was consistent with her medication. (T. 201, 379). She was also diagnosed with post-traumatic stress disorder ("PTSD") after her fourth grade teacher verbally attacked and humiliated her. (T. 379). A.B. transferred schools and testified that she liked her current teachers. (T. 30). However, A.B. still was frequently absent from school, and she told her mother that she wanted to be home-schooled instead. (T. 286-87, 379).

A.B. had a history of petit mal seizures that began around the age of two, with the most recent incident at age 10. (T. 373, 389). Her electroencephalography ("EEG") reports had been normal, and she was not on any seizure medication. (T. 190, 389). She was a physically active child, who enjoyed playing outside, running, and arts and crafts. (T. 30-36).

## IV. APPLICABLE LAW

### A. Disability Standard

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i). *See Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *3-4 (N.D.N.Y. Apr. 30, 2009) (discussing the standard for children's disability benefits). However, that definitional provision excludes from coverage any "individual under the age of

[eighteen] who engages in substantial gainful activity. . . ." 42 U.S.C. § 1382c(a)(3)(C)(ii).

The agency has developed a three-step process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then by statute and by regulation, the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the test requires examination of whether he or she suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the child is found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1. *Id*. Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed impairment, and the twelve-month durational requirement is satisfied, the

4

claimant will be found to be disabled. 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

 "Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or *medically* equal the criteria for a listed impairment. Analysis of functionality involves considering how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established by finding an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). "A marked limitation may arise when

5

several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  "To determine on

6

appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## V.   <u>THE ALJ'S DECISION</u>

As the first step in his analysis, the ALJ found that A.B. had not engaged in substantial gainful activity since December 2, 2010, the filing date of the application for benefits. (T. 12). The ALJ next found that A.B.'s "mental disorders" constituted severe impairments, as the record contained a variety of diagnoses including ADHD, PTSD, behavioral disturbance, and sleep disturbance. (T. 12). The ALJ also considered A.B's history of seizures, and references to auditory hallucinations and

migraines in her medical records. (T. 12-13). The ALJ concluded that these impairments were non-severe, in light of the available test results and the lack of any documented functional limitations associated with them. (*Id.*).

At the third step, the ALJ found that A.B. did not have an impairment or a combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1. (T. 13). The ALJ continued his analysis and found that A.B.'s severe impairments did not functionally equal the severity of a Listed Impairment under the Regulations. (*Id.*).

In making his functional equivalence determination, the ALJ considered the medical evidence, A.B.'s school records, and the hearing testimony. (T. 13-17). Based upon his review of the evidence, the ALJ found that A.B. had a marked limitation in the functional domain of attending and completing tasks. (T. 14-15). The ALJ based his findings primarily on A.B.'s diagnosed ADHD that tended to seriously impact her ability to function. (T. 14). The ALJ noted that the opinions of A.B.'s treating pediatrician, Dr. Mary Dunbar, and consultative examiner Dr. Jeanne Shapiro, as well as A.B.'s fifth grade teacher, Ms. Cynthia Randall, all found attention and concentration deficits that resulted in "considerable limitations" in attending and completing tasks. (T. 15). Treatment records also showed noticeable improvement in this area when A.B. followed her prescribed medication regimen, leading the ALJ to conclude that the limitation in this domain would likely fall to less than a marked degree with more consistent management of A.B's medication. (T. 15).

The ALJ further concluded that A.B. had a "less than marked" limitation in the

functional domains of acquiring and using information, interacting and relating with others, caring for herself, and health and physical well-being. She had no limitation in the functional domain of moving about and manipulating objects. (T. 14-17). In light of A.B's active lifestyle and the lack of any significant physical limitations in the record, the ALJ focused his analysis on these mental limitations. (T. 17). For example, the ALJ noted A.B.'s academic struggles and need for an individualized education program ("IEP"), but also that multiple evaluators had concluded that A.B had average to high intelligence, and that her academic underachievement was most attributable to her poor school attendance record. (T. 14). Likewise, while plaintiff testified to A.B.'s problems in social interaction and her frequent angry outbursts at home, the ALJ concluded that the bulk of the opinion and objective evidence showed that A.B. was friendly, cooperative, talkative, and a "pleasant child," who had shown no behavioral problems at her new school. (T. 15-16). The ALJ also evaluated inconsistencies between plaintiff and A.B.'s hearing testimony, and after taking A.B.'s behavior at the hearing into account, found that A.B.'s testimony was more persuasive. (T. 16).

Because A.B. did not have "marked" limitations in two or more of the functional domains, the ALJ concluded that A.B. was not disabled.

## VI. __ANALYSIS__

Plaintiff argues that the ALJ's determination with respect to functional equivalence is not supported by substantial evidence due to an improper evaluation of A.B's limitations in the domain of interacting and relating with others. (Pl.'s Br. at 10-15). Plaintiff also contends that the ALJ did not properly weigh the medical and

non-medical opinion evidence. This court disagrees and finds that the ALJ properly weighed the opinion evidence and that his functional equivalence findings were supported by substantial evidence.

## A.    Functional Domains

As discussed above, if the claimant's condition does not meet or medically equal a specifically listed impairment, the ALJ must determine whether claimant has an impairment or combination of impairments that functionally equals a listing. The functional equivalence determination is based upon an analysis of the six domains listed above. 20 C.F.R. § 416.926a(b)(1). Marked limitations in more than one domain would functionally equal the listings and require a finding that the claimant is disabled. 20 C.F.R. § 416.926a(d). As the ALJ found that A.B. had a marked limitation in the area of acquiring and using information, a finding of marked limitations in interacting and relating with others would be functionally equivalent to the listings, and A.B. would qualify as disabled.

## 1.    Interacting and Relating With Others

In this domain, the Commissioner considers the child's ability to "initiate and sustain emotional connections with others, develop and use the language of [her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations provide that a school-age child (age six to twelve) is expected to develop lasting friendships with children her age, begin to understand how to work in groups to create projects and solve problems, and have an increasing ability to understand another's

point of view and to tolerate differences. A school-age child "should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand." 20 C.F.R. § 416.926a(i)(2)(iv).

The regulations provide examples of limited functioning with respect to this domain. A child might have limited functioning if she does not reach out to be picked up and held by a care giver; has no close friends; avoids or withdraws from people that she knows, or is overly anxious or fearful of meeting new people or trying new experiences; has difficulty playing games or sports with rules; has difficulty communicating with others or in asking others for assistance; or has difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i)(3).

The ALJ found that A.B. had a less than marked limitation in her ability to interact and relate with others. He concluded that, although A.B had some documented problems with social interactions, she "retain[ed] some notable abilities to interact appropriately with others." (T. 15). The ALJ reached this conclusion by evaluating school records, hearing testimony, and the medical evidence.

The opinion of teachers and other non-medical sources are not entitled to controlling weight, but can be used as a valuable source of evidence in assessing the severity of an impairment and any resulting functional limitations. *Reid v. Astrue*, No. 07-CV-577 (LEK), 2010 WL 2594611 at *5, n.4 (N.D.N.Y. June 23, 2010). One of A.B.'s fifth grade teachers, Cynthia Randall, completed an evaluation on January 29,

2011.[2] (T. 195-202). Ms. Randall typically saw A.B. for about three hours a day, although she noted that A.B. was frequently absent from school. (T 195). When assessing the functional domain of interacting and relating with others, Ms. Randall ranked A.B.'s problems in "seeking attention appropriately" as "very serious," and found "serious" problems in regards to "making and keeping friends;" "introducing and maintaining relevant and appropriate topics of conversation;" and "taking turns in conversation." (T. 198). In the narrative section, Ms. Randall noted that A.B. was "very immature," had "no friends" and craved attention. (*Id.*). However, she also stated that A.B. was a "pleasant child" who was "not a behavior problem." (T. 198, 200). While Ms. Randall described some attention problems, particularly during math lessons, she noted that A.B. had "no problem" sustaining attention during play or sports activities. (T. 197). While her attendance problems created difficulties, Ms. Randall reported that A.B. had no problems with other classroom activities, such as changing from one activity to another without being disruptive, organizing her materials, and completing her class or homework assignments. (*Id.*).

A school psychological evaluation conducted in 2011 also supported the ALJ's findings that A.B. had some limitations interacting and relating to others, but that these limitations did not rise to the "marked" level. (T. 288-311). For example, A.B. required a "significant amount" of individual support from her teachers in regard to interpersonal interactions, following classroom and school rules, and getting work

---

[2] A.B.'s resource support teacher, Ms. Lucinda Bloomer, also completed an evaluation form, but noted that she had limited contact with A.B. due to her poor attendance record. (T. 220-227). The ALJ referenced this evaluation in his decision but did not significantly rely on it.

accomplished. (T. 289). While A.B. was described as "playful and friendly" she had few boundaries as to when and where she tried to socialize, and she acted less mature than her peers. (T. 289). The evaluators note that A.B.'s had "some difficulty" making friends due to her immature behavior, but that A.B. had adjusted "fairly well" to her new school and appeared to be happy and comfortable. (T. 289, 306). During the four day evaluation, A.B. was friendly and cooperative, but on the final day was "much more unfocused and somewhat lackadaisical" during the listening comprehension test and received a low score. (T. 293). The evaluator learned that A.B. had not had any sleep the night before and was going to be tested for sleep apnea the next day. (T. 292). The evaluator recommended retesting for listening comprehension, as the lack of sleep "certainly would have affected her ability to concentrate and listen." (*Id.*).

Overall, A.B. appeared to enjoy the individual adult attention during the evaluation and "used every spare moment between sub-tests to talk, make comments, move around, or make jokes." (T. 291). As the evaluation tasks became more complex, A.B. would become less careful and more impulsive about her work, and would stop what she was doing to talk or move around. (*Id.*) At one point , A.B. interrupted the evaluation to show the examiner her new shoes. (*Id.*).

Following this review, the evaluators recommended that A.B. participate in a special education program that included one period of resource support per day, and testing accommodations including extended time, a location with minimal distractions, and clarified directions. (T. 293). The evaluators did not suggest any behavioral programs in their report. As the ALJ noted in his decision, A.B.'s April 2011 IEP did

not include any behavioral modification programs. (T. 16, 316). The IEP did include an assessment of A.B.'s social development skills. It noted that A.B. had difficulty listening to others, because she would rather be the one talking. However, A.B. was described as extremely friendly and someone who loved to share her personal experiences, especially with adults. (T. 315). The IEP recognized that A.B. needed support to help recognize the appropriate time and place for doing so, and she needed to learn to listen more closely to what others had to share. (T. 315). A.B.'s difficulties in making friends with peers in her class were seen as stemming from this immature behavior. (T. 314).

Plaintiff placed great emphasis on A.B.'s difficulty making friends. (T.48-49, Pl.'s Br. at 14). However, in reaching the conclusion that A.B. had less than marked limitations in social interaction, the ALJ considered A.B.'s testimony that she had one particularly close friend with whom she visited, played games, and ate lunch with at school. (T. 15-16, 30). A.B. also described several outings with this friend and her family, including trips to a water park and the beach. (T. 34-35). While A.B. testified that she did not have other friends at school because the other children were "mean," she described her teachers as "awesome." (T. 30).

Plaintiff alleged that A.B.'s behavior was much better in school than at home. (T. 44). In light of this disparity, the ALJ considered A.B.'s behavior outside the more structured school environment with respect to her ability to interact and relate to others. *See, e.g., Smith v. Massanari*, 00-CV-0402C, 2002 WL 34242375, at *6 (W.D.N.Y. Mar. 17, 2002) (" [T]he Commissioner's regulations require the ALJ to

consider the effects of a structured or highly supportive setting . . . on the claimant's functioning and, if the claimant's symptoms or signs are controlled or reduced by the structured environment, the ALJ is required to consider the claimant's functioning outside of the highly structured setting."); *Hudson v. Astrue*, 2009 WL 1212114, at *10-11; 20 C.F.R. § 416.924a(b)(5)(iv).   For example, the ALJ considered plaintiff's testimony that A.B. frequently argued with her older sister, screamed and threw objects around the house, and threatened to hit plaintiff or A.B.'s older sister on multiple occasions. (T. 15, 44-47).   The ALJ also considered plaintiff's testimony that A.B. got along well with her other sister, who was closer in age, and that the two "did everything together." (T. 48).   Both plaintiff and A.B. testified that she enjoyed playing with her two-year-old brother, and plaintiff stated that A.B. never posed any threat to the infant. (T. 16, 58).

The ALJ gave in-depth consideration to the most serious incidents raised by plaintiff during her testimony, but concluded that plaintiff's characterization of these events was "overstated." (T. 16).   For example, plaintiff testified that A.B. had threatened to stab her older sister with a pencil. (T. 52).   At the hearing, A.B. testified that her sister had been mean to her, and that she had told her sister, "if you don't shut up, I'm going to hit you with a pencil." (T. 37).   A.B. testified that she said this "to be funny about it." (T. 37).   Plaintiff also testified that A.B. had threatened to jump out of an upstairs window. (T. 54).   When A.B. interrupted plaintiff's testimony to dispute this, plaintiff admitted that she had not been in the room when this occurred, and that she based her testimony on A.B.'s older sister's description of the incident.  (T. 54).

A.B. insisted that she had merely stuck her head out of the window. (*Id.*). The ALJ found A.B.'s testimony regarding these two incidents to be more persuasive, and noted that both incidents involved A.B.'s older sister, who had recently been found disabled due to psychotic disorders, and may have contributed to the disputes or misinterpreted A.B.'s actions. (T. 16, 54-56).

Plaintiff also alleged that A.B. had stated a desire to burn her house down. (T. 54). A.B. testified that she had said this while on medication, and that she was not serious about it. (T. 37-38). Plaintiff admitted that she did not think that A.B. would ever follow through on this threat, but did believe that A.B. was capable of hitting or hurting someone. (T. 54). The ALJ also noted that plaintiff had raised this arson threat during a January 2012 medical evaluation, and had been advised to take A.B. to the emergency room for an immediate psychiatric evaluation. (T. 17, 478). Instead, plaintiff abruptly left the appointment with A.B, and the record does not show any follow-up evaluation took place. (*Id.*).

### B.    Treating Physician

### 1.    Legal Standards

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. See 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

## 2. Application

Plaintiff's contends that the ALJ did not properly weigh the medical opinion evidence. Plaintiff argues that the Medical Source Statement submitted by one of A.B.'s treating physicians, Dr. Mary Dunbar, was entitled to controlling weight. (T. Plaintiff also objects to the ALJ's assignment of greater weight to the opinions of consultative psychiatric examiner Dr. Jeanne Shapiro and state medical consultant Dr. M. Puttanniah with regard to the domain of interacting and relating with others. (Pl.'s Br. at 15-16).

The ALJ did not reject Dr. Dunbar's opinion in its entirety. The ALJ gave Dr. Dunbar's opinion equal weight with the other opinions in the record with regards to the functional domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being. (T.

17

14-17). The ALJ gave Dr. Dunbar's opinion less weight with regard to the domains of interacting and relating with others and caring for herself. (T. 15-16).

Dr. Dunbar's Medical Source Statement is a "check the box" form that does not provide any explanation of the physician's findings. (T. 408). The Medical Source Statement notes that A.B. had been prescribed a psychiatric medication, Vyvanse, and that she had been placed on a waiting list for counseling.[3] (T. 405). Plaintiff testified that the Vyvanse was prescribed to treat ADHD while A.B. was in school. (T. 51). While the form indicated that Dr. Dunbar had treated A.B. for three months as of June 20, 2012, the record does not include any treatment notes or any other description of the scope or frequency of their treatment relationship.[4] Such cursory opinions are generally entitled to less weight. *Harrison v. Colvin*, No. 3:13-CV-835 (FJS/CFH), 2014 WL 4794406 (N.D.N.Y. 2014). Still, the ALJ offered a reasoned explanation for discounting Dr. Dunbar's opinion regarding social functioning.

Dr. Dunbar opined that A.B. had marked limitations in nine of the ten sub-categories on the Medical Source Statement related to interacting and relating with others. (T. 406-09). These included the abilities to develop lasting friends with children her own age; understand how to work in groups to create projects and solve problems; tolerate differences among peers; relate appropriately to other children and

---

[3] As of the date of the hearing, A.B. had attended one counseling session at Hutchings Psychiatric Center. Treatment notes from Hutchings are part of the record. (T. 554-573).

[4] In plaintiff's brief, she described Dr. Dunbar as a psychologist. (Pl.'s Br. at 16). Before the Appeals Council, plaintiff described Dr. Dunbar as a pediatrician. (T. 333). The Medical Source Statement does not indicate what type of treatment was provided.

adults; resolve conflicts between herself and others; recognize that there are different social rules for dealing with other children and adults; communicate in different environments; and focus less attention on parents and more on peer relationships. (T. 407). The ALJ found no support for Dr. Dunbar's opinion in the medical record. (T. 16). As described above, A.B.'s teacher described her as "pleasant," and her psychiatric evaluation portrayed her as a talkative and friendly child. (T. 198, 229). A.B. had no significant behavioral problems at school, and while plaintiff testified about A.B.'s angry outbursts and behavioral difficulties at home, the ALJ deemed plaintiff's descriptions of the most extreme examples of misbehavior not credible. While A.B. testified that she considered most of the other children at school to be mean, and had only one friend, that friendship was a close one. (T. 16, 34-36). A.B. had a similarly close relationship with one of her sisters. (T. 48). The opinion of a treating physician should not be given controlling weight when other substantial evidence in the record contradicts that opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *see also* 20 C.F.R. § 404.1527(d)(2). In light of the inconsistencies with the record, the ALJ's discounting of Dr. Dunbar's opinion as to this functional domain was supported by substantial evidence.

Instead, the ALJ gave greater weight to the opinion of consultative examiner Dr. Shapiro. (T. 16). Dr. Shapiro examined A.B. and found that her manner of relating, social skills, and overall presentation were age-appropriate. (T. 380). Dr. Shapiro also considered A.B.'s behavior at school and at home and concluded that A.B. had "trouble" interacting appropriately with children and adults, but did not

identify any marked limitations in regards to this domain. (T. 381).    The report of a consultative examiner, such as Dr. Shapiro, may serve as substantial evidence upon which the ALJ may base his decision. *Herb v. Colvin*, No. 14-CV-156, 2015 WL 2194513, at *5 (W.D.N.Y. May 6, 2015) (citing *Finney ex rel. B.R. v. Colvin*, No. 13-CV–543A, 2014 WL 3866452, at *7 (W.D.N.Y. Aug. 6, 2014) (Rep't-Rec.)); *Simmons v. Comm'r of Soc. Sec.*, No. 13-CV-5504, 2015 WL 2182977, at *16 (S.D.N.Y. May 8, 2015) (citing *Mongeur*, 722 F.2d at 1039).

The ALJ also gave greater weight to Dr. Puttanniah's opinion that A.B. had less than marked limitations in social functioning. (T. 16, 385).  Reliance on the opinions of both examining and non-examining state agency medical consultants is acceptable, as they are considered experts in social security disability.  *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2).  Opinions of non-examining sources may even override a treating source's opinions if they are supported by evidence of record.  *Diaz v. Shalala*, 59 F.3d 307, 313 (1995).  In this case, the record evidence cited by the ALJ, including Dr. Shapiro's consultative report and the hearing testimony, supported the greater weight assigned to Dr. Puttanniah's opinion.[5]

---

[5] Plaintiff argues that Dr. Puttanniah's opinion is dated May 6, 2011, and that therefore it was issued without the opportunity to review Dr. Dunbar's June 20, 2012 Medical Source Statement or Hutchings treatment notes that were not produced until August 3, 2012. (Pl.'s Br. at 14-15).  Plaintiff does not offer any reason why these documents would have altered Dr. Puttanniah's conclusion.  The ALJ reviewed this additional evidence and did not see any substantial changes from the material considered by Dr. Puttanniah.  (T. 13, n.1).  This court agrees.  Dr. Dunbar did not provide any explanation or treatment notes to support her opinion, and the Hutchings treatment notes merely summarize A.B.'s medical history and describe efforts to find a suitable psychiatric medication.  (T. 554-573).

The ALJ's determination sets forth the reasons for the weight assigned to the medical opinion evidence. Based upon all of the record evidence relied upon by the ALJ and this court's review of the record, I find that substantial evidence supports the ALJ's determination that A.B. had a less than marked limitation in the functional domain of interacting and relating to others was supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated:      September 28, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge